Mitchell J. Birzon, Esq.
**BIRZON & ASSOCIATES**
222 East Main Street, Suite 212
Smithtown, New York 11787
Tel: (631) 265-6300
Fax: (631) 265-6799
mjbirzon@bsb-lawyers.com
*Attorneys for the Plaintiff*


UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| GLORIA HOLLOWAY,<br><br>                                    Plaintiff,<br><br>                     -against-<br><br>HOLY SEE, in its Capacity as a Foreign State (the State of Vatican City), and in its Capacity as an Unincorporated Association and Head of an International Religious Organization,<br>                                    Defendant. | Case No.<br><br>COMPLAINT |

Comes now, the Plaintiff, GLORIA HOLLOWAY, (hereinafter referred to as

"**Holloway**"), by and through counsel undersigned, and for her complaint against the

Defendant, Holy See, in its Capacity as a Foreign State (State of the Vatican City), and in

its Capacity as an Unincorporated Association and Head of an International Religious

Organization (hereafter referred to as the "**Holy See**"), hereby states and alleges as

follows:

## NATURE OF THE CASE

1.     This case is about the catastrophic, longstanding and ongoing perpetration of child rape and sexual abuse by the Roman Catholic Church through its clergy and agents in the United States and the cover up of that abuse mandated by the Holy See in blatant violation of the laws of the United States, the common law of the states, federal common law and customary international law, including treaties and conventions adopted and signed by the Holy See.

2.     The aforementioned laws make the rape and sexual abuse of children a crime, impose duties to report known or suspected child abuse, require organizations and individuals to act in the best interests of children, and establish civil responsibility, all in an attempt to protect children from harm.  Indeed, the rape and sexual abuse of children is a violation of international human rights standards and conventions adopted by virtually all civilized nations.

3.     Rather than safeguarding and protecting the Plaintiff and others like her who were children at the time of their rape and sexual abuse, the Holy See has engaged in decades of extraordinary schemes and clandestine plots aimed at protecting the very criminals who routinely and with impunity raped and sexually abused minor children throughout the United States and the world.

4.     Bluntly stated, for well over fifty (50) years the Holy See has mandated that all allegations of the rape and sexual abuse of children by its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops,

2

archbishops, cardinals, brothers, sisters and/or lay-employees be kept under a cloak of absolute secrecy in flagrant violation of state, federal or international law.

5.      As a direct and proximate result of the Holy's See's decades long scheme to avoid the legal consequences of its manifestly unlawful the complete financial burden for its conduct has been borne by society in general, by the Church's faithful parishioners and most disturbingly by its helpless child victims.

6.      Simply stated, the purpose of this action is to conclusively affix blame and responsibility for these atrocities and the illegal cover up of such firmly where it belongs; squarely at the feet of the architect of it all – the Holy See.

## JURISDICTION AND VENUE

7.      The Holy See is a "foreign state" within the meaning of 28 U.S.C. §1603; hence, this Court has both personal and subject matter jurisdiction over all matters in this action with respect to 28 U.S.C. §1330, as a claim for relief with respect to a foreign state not entitled to immunity under §§1604-1607 of that title, including particularly 28 U.S.C. §§1605(a)(1), 1605(a)(2), and 1605(a)(5), which provide general conditions for non-immunity of a foreign state for any case:

- in which the foreign state has waived its immunity either explicitly or by implication, notwithstanding any withdrawal of the waiver which the foreign state may purport to effect except in accordance with the terms of the waiver; or

- in which the action is based upon a commercial activity carried on in the United States by the foreign state; or

- in which the action is based upon an act performed in the United States in connection with a commercial activity of the foreign state elsewhere; or

- in which the action is based upon an act outside the territory of the United States in connection with a commercial activity of the foreign state elsewhere and that act causes a direct effect in the United States; or

- not otherwise encompassed above, in which money damages are sought against a foreign state for personal injury occurring in the United States and caused by the tortious act or omission of that foreign state or of any official or employee of that foreign state while acting within the scope of his office or employment.

8.      Insofar as the Holy See is a "foreign state" within the meaning of 28 U.S.C. §1603, claims pursued herein are based upon commercial activities carried on in the United Sates; acts performed in the United States in connection with such commercial activities elsewhere; and/or upon acts outside the territory of the United States in connection with commercial activities elsewhere that caused a direct effect in the United States including but not limited to, *inter alia*, in the states of New York and Mississippi.

9.      The aforesaid commercial activities of the Holy See, encompass both a regular course of commercial conduct, including but not limited to fundraising activities, and particular commercial transactions or acts.

10.      Such activities carried on by the Holy See have substantial contact with the United States, including acts performed in the United States, funds raised from United States persons and sources and sent to the Holy See from organs, agencies and instrumentalities in the United States, explicit and implicit policy directives from the Holy See sent to its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees in the United States, and substantial consequences for persons within the United States resulting from the Holy See's actions.

4

11.     Insofar as the Holy See is "foreign state" within the meaning of 28 U.S.C. §1603, claims pursued herein, (not otherwise encompassed above), the Plaintiff seeks money damages for personal injury occurring in the United States and caused by the tortious acts or omissions of the Holy See and/or of its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees while acting within the scope of their office or employment within the United States, including but not limited to, in the states of New York and Mississippi.

12.     Such acts within the United States include the negligent direction and control of the Holy See's agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees as effectuated within the United States and resulting in a pattern of serious personal injury and accompanying fraudulent concealment, obstructive behavior and decades long plot to avoid the legal consequences of its conduct in the United States including but not limited to, in the states of New York and Mississippi.

13.     The failure of the Holy See, to control its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees in the United States as set out in this Complaint constitute a breach of mandatory obligations under United States and international law and is in any event not a discretionary function of the Holy See or its aforesaid agents under United States or international law.

14.    The claims asserted herein against the Holy See, in its capacity a "foreign state," arise out of the doctrine of *respondeat superior*, agency, the command responsibility doctrine, breach of fiduciary duty, negligence, negligence *per se*, violation of customary international law.

15.    The claims asserted herein against the Holy See, in its capacity a "foreign state," do not arise out of malicious prosecution abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights.

16.    The conduct of the Holy See, including its longstanding directives and refusal to comply with the civil and/or criminal statues of the various United States mandating the reporting of childhood sexual abuse, are not "discretionary acts or functions."

17.    Further, the acts of the agents, organs, agencies and/or instrumentalities, including but not limited to, priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees of the Holy See amount to criminal conduct in the nature of aiding and abetting or criminal complicity of the crime of childhood rape, sexual abuse, reckless endangerment, and obstruction of justice.

18.    Insofar as the Holy See, is a "foreign state" within the meaning of 28 U.S.C. §1603, claims pursued herein, not otherwise encompassed above, also seek money damages for personal injury occurring in the United States and caused by, among other things:

- The tortious acts of the Holy See's  agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees agents, acting

in the United States for which it is liable under recognized principles of *respondeat superior* and vicarious liability; and/or

- Tortious acts and negligence of the Holy See and its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees agents in the United States in selecting, supervising, or otherwise controlling or failing to control its aforesaid agents in the United States. as well as the resulting harm, occurred in the United States; and/or

- The tortious acts and negligence of the Holy See with respect to duties owed to Plaintiff under United States law, duties which it breached by its actions and patterns of action and inaction in the United States, including its prescription, enforcement and non-enforcement, and dissemination by managerial agents of the Holy See of directives and guidelines to be followed in the United States; and/or

- The tortious acts of the agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees of the Holy See acting with its apparent authority and/or the negligence in enabling the concealment the commission of such tortious acts.  Said apparent authority and/or opportunity for concealment arises from an agency relationship occurring in the United States, in addition to the injury occurring in the United States.

19.    Such claims are not based on discretionary functions under United States or international law.  Nor do these claims against the Holy See, in its capacity a "foreign state," arise out of malicious prosecution, abuse of process, libel, slander, misrepresentation, deceit, or interference with contract rights, but rather arise out of the doctrine of respondeat superior, violations of customary international law, negligence, breach of fiduciary duty, and infliction of emotional distress.

20.    Insofar as the Holy See is a "foreign state" for the purposes of the Foreign Sovereign Immunities Act ("FSIA"), as defined in 28 U.S.C. §1603, it has implicitly or

explicitly waived any rights under, and/or is estopped from raising, the Foreign Sovereign
Immunities Act as a defense to suit by, among other things, failing to raise such defense
over a period of decades in settling and acquiescing in settlements of childhood sexual
abuse claims against or with respect to itself or its organs, agencies, or instrumentalities
in the United States, over which it exercises absolute control and authority under its own
CODE OF CANON LAW.

21.     At all times relevant hereto, the actions of the Holy See, occurring in the
United States include the transmission and receipt in the United States of policies,
directives, orders or other direction or guidance, whether explicit or implicit in
furtherance of its fraudulent concealment, obstructive behavior and decades long efforts
to avoid the legal consequences of its conduct.

22.     The actions of the Holy See at issue herein present fundamental issues of
human rights and the protection of children which have never been given immunity by
the United States government.

23.     Fundamental human rights violations are subject to accountability in the
Federal Courts of the United States in the period preceding adoption of the FSIA.  There
is no evidence that the Congress of the United States sought to immunize such
fundamental human rights of children from accountability in our courts by the adoption
of the FSIA.

24.     In the alternative, Insofar as the Holy See, is not a "foreign state" within the
meaning of 28 U.S.C. §1603, oi if the Foreign Sovereign Immunities Act is not
applicable to any category of claims in this Complaint because such claims preceded the

8

enactment of the FSIA, or any period of retroactivity under FSIA, or if for any other reason the FSIA does not apply to this action, or any part of it, and insofar as the Holy See is an unincorporated association and headquarters of an international religious organization, this Court has subject matter jurisdiction over all such matters in this action with respect to 28 U.S.C. §§1331 and 1332.

25.    In the alternative, insofar as the Holy See, is not a "foreign state," or to the extent that it is an unincorporated association and headquarters of an international religious organization, or if for any other reason the FSIA does not apply to this action, or any part of it, this Court has federal question subject matter jurisdiction pursuant to 28 U.S.C. §1331, because claims pursued herein allege violations of customary international law as codified in international treaties, including but not limited to the *Universal Declaration of Human Rights* and the *Convention on the Rights of the Child.*  Customary international law, as well as treaties and acts of Congress, are the "supreme law of the land" pursuant to Article VI of the United States Constitution.  Issues of interpretation and application of such customary international law provide federal question jurisdiction under §1331.

26.    In the alternative, insofar as the Holy See, is not a "foreign state," or to the extent that it is an unincorporated association and headquarters of an international religious organization, or if for any other reason the FSIA does not apply to this action, or any part of it, this Court has diversity subject matter jurisdiction pursuant to 28 U.S.C. §1332, because the matter in controversy as to the Plaintiff exceeds the sum of $75,000,

exclusive of interest and costs, and are between citizens of a state or states and a citizen of a foreign state.

27.     For all claims herein upon which subject matter jurisdiction is based upon 28 U.S.C. §1331 or §1332, this Court has personal jurisdiction over the Holy See, pursuant to CPLR 302.

28.     The claims herein arise from the Holy See's, acts, directly or those of its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees: in transacting business in the states of New York and Mississippi; causing tortious injury by an act or omission in the states of New York and Mississippi; and/or causing tortious injury in by an act or omission outside the states of New York and Mississippi.

29.     The Holy See, regularly does or solicits business, or engages in a persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in the states of New York and Mississippi and the tortious injuries occurring in the states of New York and Mississippi arise out of that doing or soliciting of business or a persistent course of conduct or derivation of substantial revenue within the states of New York and Mississippi.

30.     This Court has supplemental jurisdiction pursuant to 28 U.S.C. §1367 over all other claims herein that that are so related to the claim or claims that form the basis of the Court's original jurisdiction that they form part of the same case or controversy under Article III of the United States Constitution.

31.     Venue is proper in this Court pursuant to 28 U.S.C. §1391.

32.     Insofar as the Defendant, Holy See, is a "foreign state" for the purposes of the Foreign Sovereign Immunities Act, as defined in 28 U.S.C. §1603, service of process is shall be pursuant to 28 U.S.C. §1608(a).

33.     In the alternative, insofar as the Holy See, is not a "foreign state," and to the extent that it is an unincorporated association and headquarters of an international religious organization, or if for any other reason the Foreign Sovereign Immunities Act does not apply to this action, or any part of it, service of process is effected pursuant to Fed. R.Civ.P., Rules 4 and 5 and/or New York CPLR 313.

## THE PARTIES

34.     The Plaintiff, Holloway, is a victim of rape and sexual abuse committed by the agents, organs, agencies and/or instrumentalities, of the Holy See, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees and is an adult female citizen of the state of New York.

35.     The Plaintiff, Holloway, was a minor and resident of the State of Mississippi and citizen of the United States at the time of her rape and sexual abuse as alleged herein.

36.     The Plaintiff, Holloway suffers ongoing emotional and psychological injuries which were caused by the rape, sexual abuse, fraudulent concealment and obstructive behavior of the Holy See and its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees as alleged herein.

37.     The Holy See is the sovereign nation located in the Vatican City State, Italy and the ecclesiastical, governmental, and administrative capital of the Roman Catholic Church and seat of the Supreme Pontiff.

38.     The Holy See is the composite of the authority, jurisdiction and sovereignty vested in the Supreme Pontiff and his delegated advisors and/or agents to direct the activities and business of the worldwide Roman Catholic Church.

39.     The Holy See has unqualified power over the Catholic Church including each and every individual and section of the church including but not limited to all priests, Bishops, Archbishops, Metropolitans, Cardinals, and all other church workers, as well as dioceses, archdioceses, ecclesiastical provinces, and orders.

40.     The Holy See directs, supervises, supports, promotes and engages in the oversight of the sovereign nation, the organization, and its employees for the purpose of the business, foreign affairs, and employees of the worldwide Roman Catholic Church, and provides religious and pastoral guidance, education and counseling to Roman Catholics worldwide in exchange for all or a portion of the revenues collected from its members.

41.     The Holy See engages in some of its activities and business through its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees who work under its authority.

42.     The Holy See actively engages in commercial activity in the United States by collecting contributions from members.  Moreover, the Plaintiff's claims are based in

12

part on her perpetrator's commercial employment relationship with the Holy See and its

agents, organs, agencies and/or instrumentalities, including but not limited to, its priests,

clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees.  The

relevant employment relationship is not peculiar to a sovereign as the employment is not

part of civil service, the diplomatic corps, or the military, nor were the perpetrator(s)

privy to governmental policy deliberations or engaged in legislative work.

43.    The Holy See also actively engages in commercial and business activity in

the United States by recruiting and soliciting people to become members and contribute

to the financial operation of the Roman Catholic Church, including overseeing the

Society for the Propagation of the Faith in every diocese, including but not limited to, the

Archdiocese of New York, the Diocese of Brooklyn, the Diocese of Rockville Center,

and the Diocese of Jackson, Mississippi.

44.    The Holy See is a unique entity, with an organizational structure and chain

of command that mandates that the Holy See and his head of state, the Supreme Pontiff,

have a significantly high level or involvement in the routine and day-to-day activities of

its agents and instrumentalities, particularly with respect to the handling of clergy who

have engaged in certain specified conduct, including child rape and/or sex abuse.

45.    The Holy See enters into treaties and conventions with other foreign states,

including but not limited to the Universal Declaration of Human Rights, the Convention

on the Rights of the Child and the Convention Against Torture; maintains diplomatic

relations with other foreign states, including the United States; and has observer status in

the United Nations.

46.     The Holy See engages in commercial and business activity in the States of New York and Mississippi, throughout the United States and throughout the world.

47.     As part of its fundraising activities, Defendant Holy See oversees a pontifical mission society, the Pontifical Society for the Propagation of the Faith.

48.     The Society for the Propagation of the Faith was founded in 1822 and has a central office in Rome under the oversight and control of the Holy See.

49.     Through offerings in New York, Mississippi, the United States, and worldwide, "the Society for the Propagation of the Faith provides ongoing support for the pastoral and evangelizing programs of the Catholic Church in Africa, Asia, the Pacific Islands and remote regions of Latin America." (https://missionsla.org/programs/the-society-for-the-propagation-of-the-faith/; last visited January 16, 2019).

50.     Each diocese has a separate Society for the Propagation of the Faith under the control and oversight of the Holy See, including, but not limited to, the Archdiocese of New York and the Diocese of Jackson, Mississippi.

51.     The money donated to the Society for the Propagation of the Faith is sent to the pontifical Mission Societies in the United States headquartered in New York, which is also under the direction and control of the Holy See.  The Society for the Propagation of the Faith takes donations and has special collections specifically for the mission.

52.     The Holy See's business or private operation, in addition to overseeing its employees not engaged in work peculiar to a sovereign, performs acts that are commercial in nature, including extensive financial operations and fundraising activities throughout the United States.

14

53.     Consistent with its corporate structure, the Holy See has instituted worldwide, mandatory policies that perpetuate its financial strength and stability, particularly through the Society for the Propagation of the Faith.

54.     As part of its fundraising activities, the Holy See has continued the long and entrenched tradition of Peter's Pence.

55.     Peter's Pence fundraising for the Holy See has been active since 1871 when it was created by the "*Saepe Venerabilis*" encyclical authored by Supreme Pontiff Pius IX.

56.     Members of the Roman Catholic Church are encouraged to send their donations throughout the year directly to the Office of the Holy Father in Vatican City, but the Holy See also directs and coordinates an international campaign each and every year on June 29 or the closest Sunday to the Solemnity of Saints Peter and Paul for its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees to take up a specific collection for the benefit of the Holy See. (http://www.vatican.va/roman_curia/secretariat_state/obolo_spietro/documents/index_en. htm last visited January 16, 2019).

57.     Peter's Pence raises funds that are required to be sent directly to the Holy See.

58.     Dioceses, Bishops, Archbishops and other agents of the Holy See are ordered to send the funds directly to "His Holiness Supreme Pontiff Francis, 00120, Vatican City."

59.     As part of Peter's Pence, the Holy See is involved in the United States in creating materials to advertise for its campaign and benefits directly from solicitation letters sent to members of its organization throughout the United States.

60.     The Holy See also is directly involved in and authorizes and supports appeals at parishes throughout the United States for members to give money to the Holy See and the creation and distribution of materials to help its agents recruit fund for the Peter's Pence Collection.

61.     The Holy See also uses other forms of media such as ads and posters to solicit funds in the United States.

60.     Upon information and belief, the Peter's Pence operation has provided the Holy See with millions of dollars each year from the United States.

62.     The Peter's Pence collection brought in almost $80 million for the Holy See in 2007 and over $100 million in 2006, with the United States providing the largest percentage of the funds.

63.     The Holy See's business divisions in the United States facilitate the largest portion of money collected for the Holy See in the Peter's Pence Collection.

64.     As part of this campaign the  Holy See and its agents, organs, agencies and/or instrumentalities, including but not limited to, its priests, clerics, bishops, archbishops, cardinals, brothers, sisters and/or lay-employees recruit and solicit people to become paying members of the organization.

65.     The Holy See also assesses each Bishop, Archbishop, and Cardinal a tax for certain activities.  This is money that is required to be sent to the Holy See.

16

66.     The Holy See also assesses a monetary amount that each Diocese, Archdiocese, Bishop, Archbishop and Cardinal must pay annually to Holy See. Generally, this amounts to thousands of dollars from each Diocese, including but not limited to those located within the States of New York and Mississippi, respectively.

67.     The Holy See has direct involvement with seminaries in the United States including in the states of New York and Mississippi, where it trains its agents in its organization and operation.

68.     On August 15, 1990, Supreme Pontiff John Paul II issued an apostolic constitution on Catholic higher education entitled *Ex cord Ecclesiae*.

69.     The Apostolic Constitution described, in detail, the top-down relationship between Defendant Holy See and its educational institutions like seminaries.

70.     According to the Catholic Church Extension Society, no matter where it's located or how it's structured, every institution within the organization answers to the Holy See.

71.     The Holy See's Congregation for Catholic Education has jurisdiction over all Catholic institutions of higher learning, including seminaries.

72.     As a result, it oversees and controls the admissions requirements and curricula to ensure that candidates are properly prepared.

73.     In addition, since 1971, U.S. seminaries have adhered to the Program of Priestly Formation (PPF) promulgated by the U.S. bishops' conference and also approved by Rome.

74.     The Holy See has a vast enterprise in the United States which recruits solicits members in order to support its business operations in the United States and worldwide.

75.     The Holy See is solely responsible for creating new divisions of its business and private enterprise (called a "Diocese" or "Archdiocese") around the world.  Only the Holy See has this power.

76.     The Holy See created all of the dioceses in the states of New York and Mississippi, including the Archdiocese of New York and the Diocese of Jackson.

77.     The Holy See creates, divides and re-aligns dioceses, archdioceses and ecclesiastical provinces.

78.     The Holy See gives final approval to the creation, division or suppression of provinces of religious orders and it is solely responsible for modification or elimination of one of the divisions of its business enterprise.

79.     The Holy See reserves the exclusive right to perform numerous local activities within its business operation within the United States including, but not limited to, overseeing and managing the Society for the Propagation of the Faith, laicization of clerics, dispensations from its rules and regulations, and appeals of a bishop's decision.

80.     The Holy See has control over and involvement with property owned by all Catholic entities in the states of New York and Mississippi.

81.     The Holy See's permission is required for the alienation (sale, gift, etc.) of much of the property owned by Catholic Entities in the states of, *inter alia*, New York and Mississippi.

18

82.     The Holy See directly and definitively controls the standards, morals, and obligations of the clergy of the Catholic Church.

83.     The Holy See also does this by and through its agents , organs and/or instrumentalities, including the Congregation for the Clergy and the Congregation for Religious, both delegated by the Supreme Pontiff and acting on his behalf and under his authority.

84.     The Holy See interacts with its local business units including those in the United States in a manner that controls their day-to-day business and provides for no discretion on numerous issues, and in particular the handling of child rape and sexual abuse by clergy and the determinations whether clergy remain in the Holy See's employ.

85.     The Holy See routinely promulgates its policies through various means including encyclical, canon law, and Papal pronouncements.

86.     The Holy See controls, *inter alia*, where its priests, clerics, bishops, archbishops, cardinals, brothers and/or sisters live and prohibits certain conduct by such individuals.

87.     At times, the Holy See has prohibited its clerics from gambling, carrying arms, hunting, or spending time at a tavern without just cause.

88.      The Holy See has also prohibited its clerics from practicing medicine or surgery, from being a legislator, or volunteer for the army.

89.     The Holy See promotes the sacred liturgy, directs and coordinates the spreading of its doctrine, and undertakes other actions necessary to promote its doctrine.

19

90.     The Holy See creates, appoints, assigns and re-assigns bishops, superiors of religious orders, and through the bishops and superiors of religious orders has the power to directly assign.

91.     The Holy See has the final and sole power to remove individual clergy.

92.     All bishops, clergy, and priests, including religious order priests, vow to show respect and obedience to the Supreme Pontiff and their bishop.

93.     The Holy See also examines and is responsible for the work and discipline and all those things which concern bishops, superiors of religious orders, priests and deacons of the religious clergy.

94.     In furtherance of this duty, the Holy See requires bishops to file a report, on a regular basis, outlining the status of and any problems with clergy.

95.     The Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline for its members and those who serve in the governmental, administrative, judicial, educational and pastoral workings of the Catholic Church worldwide.

96.     The Holy See is also directly and solely responsible for removing superiors of religious orders, bishops, archbishops and cardinals from service in the various divisions and offices of the Catholic Church.

97.     The Holy See buys and sells real and personal property, and purchases and supplies goods and services in pursuit of its private and business activities.

98.     The Holy See, (beyond its collection through Peter's Pence and other means), is supported through the contributions of its parishioners, which are received as

20

part of a regular course of commercial conduct in the form of donations of money, real property and personal property.

99.     A major source of funds for the Holy See is monies received from its parishioners in the form of tithing.

100.    The amount of money flowing to the Holy See from the United States is directly affected by the beliefs of its parishioners in the righteousness of the Holy See and its conduct.

101.    As members of the Roman Catholic Church, its parishioners are obligated to revere, respect, and obey the edicts issued from the Holy See, and are under threat of a denial of the sacraments or excommunication if they do not follow those edicts.

102.    Another major source of funding that the Holy See and its agents receive is in the form of tuition for attendance at its Catholic Schools.

103.    The Holy See directs and mandates the morals and standards of conduct of all clergy of the Roman Catholic Church by and through its agents organs and/or instrumentalities, by enforcement of its rules and regulations written and promulgated by the Holy See and used as the employee manual for clergy.

104.    The Holy See creates, appoints, assigns, reassigns and retires all clerics, bishops, archbishops and cardinals.

105.    The Holy See accords definitive approval to the election of the heads of religious orders and, through the religious superiors and the bishops of dioceses, it exercises the power to directly assign and remove individual priests and deacons.

106.    The Holy See determines whether religious orders are to be disciplined for inappropriate behavior and whether they may remain in the Church following inappropriate behavior.

107.    All bishops, priests and clergy, including religious order priests, vow to show respect and obedience to the Holy See.

108.    When a priest is ordained, he kneels before his bishop and promises him and his successors obedience and respect. On the day a priest receives the fullness of the priesthood in his ordination to the episcopacy, he stands before his consecrators and the assembled people of God and promises his obedience and loyalty to the supreme Roman pontiff, the Holy See. He receives financial support throughout the full length of his life, and he may not be deprived of his pension or his clerical status unless the Holy See approves.

109.    Each Cardinal takes an oath upon becoming a Cardinal which requires obedience to the Holy See and also requires secrecy in certain circumstances.

110.    An English translation of that oath is "I [name and surname], Cardinal of the Holy Roman Church, promise and swear to be faithful henceforth and forever, while I live, to Christ and his Gospel, being constantly obedient to the Holy Roman Apostolic Church, to Blessed Peter in the person of the Supreme Pontiff [name of current Pontiff], and of his canonically elected Successors; to maintain communion with the Catholic Church always, in word and deed; not to reveal to anyone what is confided to me in secret, nor to divulge what may bring harm or dishonor to Holy Church; to carry out with

great diligence and faithfulness those tasks to which I am called by my service to the Church, in accord with the norms of the law."

111.   The Holy See examines and is responsible for the work and discipline and all those things which concern bishops, superiors or religious orders, priests and deacons. In furtherance of this duty, the Holy See, among other things, requires bishops to file a report, on a regular basis, outlining the status of and any problems with priests and clergy.

112.   The Holy See promulgates and enforces the laws and regulations regarding the education, training and standards of conduct and discipline for those who serve in the governmental, administrative, judicial, educational and pastoral workings of the Roman Catholic Church worldwide.

113.   No priest, cleric, superior of a religious order, bishop, archbishop or cardinal may be removed from service without the approval of the Holy See; nor can any priest, cleric, superior of a religious order, bishop, archbishop or cardinal remain in service over the objection of the Holy See.

114.   The Holy See is directly and absolutely responsible for removing bishops, archbishops and cardinals from service in the various divisions and offices of the Roman Catholic Church by issuing instructions, mandates and dictates in the United States.

115.   As part of its business and private operation the Holy See requires its agents in charge of its operation in a particular geographical location to come to Rome and report about the state of the Holy See's operations, including any problems involving issues that are commercial in nature, including financial status and business issues.  The

Holy See calls these *Ad Limina* visits.  These agents, as appointed leaders of the local business and private operations including those in the United States, are required to make this visit at least once every five years.

116.    As part of its business and private operation, the Holy See also requires its divisions to write detailed reports about the status of the operation including but not limited to personnel issues, finances, and real estate holdings.

117.    With respect to the income of pastors and their supervisors, the Holy See requires information regarding whether it is form real estate, public funds, or from a contribution made by the faithful or by the diocese.  These reports are sometimes called "quinquennial reports."

118.    The Holy See has the ultimate authority to give approval or disapproval to the settlement of legal claims, and the terms of such settlements, against its agents, including priests, clerics, superiors of religious orders, bishops and archbishops, arising out of childhood sexual abuse in the states of, *inter alia*, New York and Mississippi, the United States and throughout the world.

119.    The Holy See enters into treaties and conventions with other foreign states, including but not limited to the *Universal Declaration of Human Rights,* (www.un.org/en/udhrbook/pdf/udhr_booklet_en_web.pdf ; last visited March 4, 2019), and the *Convention on the Rights of the Child,* (https://www.ohchr.org/en/professionalinterest/pages/crc.aspx; last visited March 4, 2019), maintains diplomatic relations with other foreign states, including the United States, and has observer status in the United Nations.

24

## GENERAL ALLEGATIONS

120.    The problem of the rape and sexual abuse of children committed by Roman Catholic clerics and others within the Holy See's control is almost as old as the Roman Catholic Church itself.

121.    The first formal legislation was passed at the Council of Elvira in Spain in 306 A.D.

122.    This council passed legislation condemning rape and sexual abuse by the clergy, including sexual abuse of boys.  The Council of Elvira was the first in a series of legislative attempts by the Roman Catholic Church to curb its problem of the rape and sexual abuse of children committed by its clergy.

123.    In the 11ᵗʰ century, a writing authored by Father Peter Damien, THE BOOK OF GOMORRAH, was presented to the Holy See.  This work encouraged punishment of priests and clerics who raped and abused children, particularly boys.

124.    In 1917 the Holy See, codified all of its rules, regulations and laws, including those applicable to the conduct of priests and clergy, in one document known as the CODE OF CANON LAW.

125.    The CODE OF CANON LAW specifically made it a crime for priests and clerics to have sexual relations or relationships with children under the age of sixteen, demonstrating that the Holy See, was well aware of the centuries-old practice of the rape and sexual abuse of children by Roman Catholic priests and clerics.  Even today, the

current version of the Code (Vatican II), the rape and sexual abuse of children by priests and clerics is expressly forbidden.

126.    The Holy See has known about the widespread problem of the rape and sexual abuse of children committed by its clergy for centuries but has covered up that abuse.  Secret settlement agreements with victims were used to silence the victims and their families and to protect the abuser from criminal prosecution by in the states of, *inter alia*, New York and Mississippi, the United States and throughout the world.

127.    This practice was designed to shield the Holy See, from scandal, and has been mandated not only in the United States but throughout the world, including North and South America, Europe and Australia.

128.    The Holy See is responsible for the historically verified practice of bishops moving sexually abusive priests to areas where allegations of the offender's abusive conduct were not known.

129.    The Holy See has never taken appropriate steps to remove sexually abusive priests from the ministry.

130.    The absolute power of the Holy See, over its bishops in the United States was demonstrated in 2002, when the U.S. Conference of Catholic Bishops adopted a proposed policy designed to protect children from priest sexual abuse.  The bishops were powerless to implement this policy without approval from the Holy See.

131.    The Holy See, *inter alia*, denied approval of key provisions sought by the U.S. Bishops which would have required that its agents in the states of, *inter alia*, New

York and Mississippi, the United States and throughout the world to report all known or suspected child abuse to the civil authorities.

132.    The Holy See, *inter alia*, refused to give the bishops in the states of, *inter alia*, New York and Mississippi, the United States and throughout the world the power to remove abusive priests from the ministry.

133.    While the "public" policy of the Holy See, is to forbid the rape and sexual abuse of children by priests and clerics within its control, the actual "private" or secret policy is to harbor and protect its abusive priests, clerics, bishops, archbishops, cardinals, agents, and employees from public disclosure and prosecution, in order to maintain its aura of infallibility and thereby ensure that its parishioners, followers and financial contributors in the states of, *inter alia*, New York and Mississippi, the United States and throughout the world will not lose faith and fail to contribute money and property to the Holy See.

134.    In furtherance of its decades of fraudulent concealment and obstruction the Holy See has mandated a multi-level policy of mandatory secrecy over all matters involving the administrative, legislative and judicial activities of the Vatican offices and departments under the direct authority of the Pope, as well as over all similar activity in the various dioceses throughout the world including but not limited to, the states of, *inter alia*, New York and Mississippi.

135.    The highest level of secrecy is the absolute secrecy mandated for all communications which take place in the sacrament of penance, commonly referred to as "confession."

27

136.    The highest level of secrecy outside the confessional is known as the "Pontifical secret," which is imposed on certain activities of the various departments or congregations of the Holy See.

137.    Violation of the Pontifical Secret results in certain penalties, including excommunication.

138.    In 1962, Defendant Holy See released the confidential document, Instruction on The Manner of Proceeding in Cases of Solicitation, (The Vatican Press, 1962), available at http://www.vatican.va/resources/resources_crimensollicitationis-1962_en.html (last viewed September 13, 2018) (hereinafter referred to as "*Crimen Sollicitationis*").

139.    On its face, the heading of the *Crimen Sollicitationis* states "From the Supreme and Holy Congregation of the Holy Office To All Patriarchs, Archbishops, Bishops and Other Diocesan Ordinaries 'Even of the Oriental Rite'" and contains mandatory and specific instructions regarding the handling of child sex abuse by clergy. It permits no discretion in the handling of such cases.

140.    According to the *Crimen Sollicitationis* itself, it is an "instruction, ordering upon those to whom it pertains to keep and observe it in the minutest detail." *Crimen Sollicitationis* at paragraph 24. 81. This 1962 document again reinforced that the Holy See had knowledge that there was a systemic problem of its agents raping and abusing sexually children.

141.    In May of 2000, the Irish government established a Commission to Inquire into Child Abuse which was to perform three primary functions: (a)  to hear evidence of

28

abuse from persons who allege they suffered abuse in childhood, in institutions, during the period from 1940 or earlier, to the present day; (b) to conduct an inquiry into abuse of children in institutions during that period and, where satisfied that abuse occurred, to determine the causes, nature, circumstances and extent of such abuse; and (c) to prepare and publish reports on the results of the inquiry and on its recommendations in relation to dealing with the effects of such abuse.

142.    The Irish Commission to Inquire into Child Abuse generated an in-depth report that investigated and analyzed the rape and sexual abuse of children by clergy and documented that the Catholic Church had a systemic problem of numerous clergy raping and sexually abusing children.

143.    The report generated by the Commission to Inquire into Child Abuse reached several conclusions including but not limited to: (a) cases of sexual abuse were managed within the institution with a view to minimizing the risk of public disclosure and consequent damage to the institution; (b) the offenses were not reported to the police; (c) the recidivist nature of sexual abuse was well known to authorities within the institution; (d) the Church authorities knew that the sexually abusive clergy were often long-term offenders who repeatedly abused children wherever they were working; (e) when confronted with evidence of sexual abuse, a standard response of the religious authorities was to transfer the offender to another location where, in many instances, he was free to abuse again; sexual abuse was endemic in boys' institutions. http://www.childabusecommission.ie/  (last viewed January 2019).

144. The Holy See was an active manager and mandated the policies that led to these horrific occurrences in Ireland.

145. The Holy See has been involved in the formation of secret facilities in the United States where sexually offending clergy would be sent for short periods of time.

146. In 1947, Father Gerald Fitzgerald founded the Congregation of the Servants of the Paracletes to deal with so-called "problem priests" after having become convinced of their inability to change he wrote regularly to bishops in the United States and to Vatican officials, including the pope, of his opinion that many sexual abusers in the priesthood should be laicized immediately. www.ncronline.org/news/accountability/bishops-were-warned-abusive-priests (last viewed January 2019).

147. By the mid-1950s, Father Fitzgerald had become so convinced of the inability of priests engaging in the rape and sexual abuse of children to change that he searched for an island to purchase with the intent of using it as a place to isolate such offenders. www.ncronline.org/news/accountability/bishops-were-warned-abusive-priests (last viewed January 2019).

148. At the request of the prefect, Cardinal Alfredo Ottaviani, one of the Holy See's officials, Father Fitzgerald prepared a report dated April 11,1962.

149. In Father Fitzgerald's April 1962 report to the Pope he specifically discussed the various types of sexual problems of priests, including sexual abuse of minors: "On the other hand, where a priest for many years has fallen into repeated sins which are considered, generally speaking, as abnormal (abuse of nature) such as

homosexuality and most especially the abuse of children, we feel strongly that such

unfortunate priests should be given the alternative of a retired life within the protection of

monastery walls or complete laicization."

150.    In 1963, Father Fitzgerald had a private audience with Supreme Pontiff

Paul VI (1963-1978) and on August 27, 1963, submitted a further report to him at the

Pope's request in which he clearly articulated his concerns regarding priests who sexually

abuse minors: "Problems that arise from abnormal, homosexual tendencies are going to

call for, not only spiritual, but understanding psychiatric counseling.  Personally, I am not

sanguine of the return of priests to active duty who have been addicted to abnormal

practices, especially sins with the young....Where there is indication of incorrigibility,

because of the tremendous scandal given, I would most earnestly recommend total

laicization "

151.    The Holy See kept Father Fitzgerald's reports secret under its longstanding

policy to avoid scandal at all costs.

152.    At the time of the creation and implementation of the *Crimen Sollicitationis*

in 1962, the Holy See knew that it had a widespread problem of its clergy raping and

sexually abusing children, including in the United States, and it authorized, facilitated

and participated in the creation of secret facilities in the United States where sexually

offending clergy could be sent before they were moved to another parish to work and

potentially abuse again.

153.    The Holy See's *Crimen Sollicitationis* specifies in paragraph 4 that although

the penalty for a Catholic member who violates the vow of secrecy regarding child sex

abuse by clergy is usually excommunication, extreme cases can also result in removal from ministry or "they [the Ordinary, or controlling agent] will also be able to transfer him to another [assignment], unless the Ordinary of the place has forbidden it because he has already accepted denunciation and has begun the inquisition."

154.    Through this policy and others the Holy See has and continues to knowingly allow, permit and encourage the rape and sexual abuse of children by its agents, including the Reverend Timothy Cawley.

155.    The Holy See retains at all times the power over who conducts the "inquisition" that investigates claims regarding the "crime of solicitation." *Crimen Sollicitationis* at paragraph 2.

156.    While the Holy See delegates power over such investigative proceedings to its chosen agents, it retains the unilateral power at all times to "summon [] the case to itself." Id.

157.    In addition, if it is unclear whether the "denounced person" is under the jurisdiction of any of  the Holy See's agents, the *Crimen Sollicitationis* mandates that the agent with knowledge of the abuse to send the case "to the Supreme Holy Congregation of the Holy Office." *Crimen Sollicitationis* at paragraph 3l.

158.    The Holy See specifically has carved out the treatment of rape and sexual abuse of children by its clergy from other employment issues in order to have continuing control over this issue.

159.    The Holy See governs the treatment of rape and sexual abuse of children by its clergy every day and perpetually according to non-negotiable and mandatory

standards that it first set into place in 1867, which is approximately when civil law also outlawed child sex abuse, and then reiterated and elaborated in 1922, 1962 and 2001.

160.    The Holy See has defined the "worst crime" to be covered by its dictated procedures, standards, and mandatory treatment, as "any obscene, external act, gravely sinful, perpetrated in any way by a cleric or attempting by him with youths of either sex or with brute animals (bestiality)." *Crimen Sollicitationis* at paragraph 73.

161.    The Holy See grants no discretion given to its agents in the handling of cases involving the rape and sexual abuse of children: Each and every one pertaining to the tribunal in any way or admitted to knowledge of the matters because of their office, is to observe strictest secret, which is commonly regarded as a secret of the Holy Office, in all matters and with all persons, under the penalty of excommunication *latae sententiae*, *ipso facto* and without any declaration [of such a penalty] having been incurred and reserved to the sole person of the Supreme Pontiff, even to the exclusion of the Sacred Penitentiary, are bound to observe [this secrecy] inviolably.  *Crimen Sollicitationis* at paragraph 11.

162.    The Holy See mandates secrecy for all those involved, including agents and itself, in handling allegations of sexual abuse.  Penalties for the crime of solicitation include an order to move offending priests to other locations once they have been determined to be "delinquent."

163.    In response to allegations of the rape and sexual abuse of children, the *Crimen Sollicitationis* mandates that supplementary penalties include 'As often as, in the prudent judgment of the Ordinary, it seems necessary for the amendment of the

delinquent, for the removal of the near occasion [of soliciting in the future], or for the prevention of scandal or reparation for it, there should be added a prescription for a prohibition of remaining in a certain place." *Crimen Sollicitationis* at paragraph 64.

164.    The Holy See creates and maintains this policy of secrecy and transfers, enumerated within *Crimen Sollicitationis* by threatening all involved with excommunication and, thus, damnation, if they do not comply.

165.    According to *Crimen Sollicitationis*, once these non-discretionary penalties are levied, only the Holy See through the Congregation of the Holy Office, has the power to alter or remit the punishment.

166.    In *Crimen Sollicitationis*, the Holy See created a specific procedure which local Ordinaries, as agents of the Holy See were required to follow.

167.    The commandment of silence regarding cases of the rape and sexual abuse of children embodied in the instruction on penalty of removal (excommunication) operated to deprive the local agents of any meaningful discretion.

168.    Even if *Crimen Sollicitationis* can be read to allow the local agent of the Holy See to choose one of a limited number of options, the instruction from the Holy See nonetheless mandates which of those specific options should be chosen, and mandates how each is to be handled.  In addition, the Holy See reserves to itself the power to reverse whichever of the limited set of options is chosen.

169.    In 1988 the Holy See issued another mandatory and specific policy that reiterated that its Congregation for the Doctrine of Faith had the power over crimes against morals, which includes the rape and sexual abuse of children by its priests. This

document was Apostolic Constitution called *Pastor Bonus* (available at

http://www.bishopaccountability.org/AtAGlance/church_docs.htm ) (last visited January

2019.)

190.    In 1990, Bishop A. James Quinn, at a Midwest Canon Law Society

Meeting told of a policy where Bishops could send documents that "you really don't want

people to see" to the Vatican embassy in Washington "because they have immunity."

(available at http://www.bishopaccountability.org/AtAGlance/church_docs.htm ) (last

visited January 2019.)

191.    On or about April 30, 2001, Supreme Pontiff John Paul II issued an

Apostolic Letter, *Sacramentorum Sanctitatis Tutela*, (available at

http://www.bishopaccountability.org/resources/resource-

files/churchdocs/SacramentorumAndNormaeEnglish.htm  last visited January 2019),

which confirms the direct relationship between the Holy See and employees who commit

these crimes of solicitation.

192.    The *Sacramentorum Sanctitatis Tutela* mandate supplemented the 1962

*Crimen Solicitationis* and confirmed its position as an executive disciplinary handbook:

"It is to be kept in mind that an Instruction of this kind had the force of law since

the Supreme Pontiff, according to the norm of can. 247, S 1 of the Codex *Iuris Canonici*

promulgated in 1917, presided over the Congregation of the Holy Office, and the

Instruction proceeded from his own authority... Supreme Pontiff Paul VI... confirmed the

Congregation's judicial and administrative competence...Finally, by the authority with

which we are invested, in the Apostolic Constitution, Pastor Bonus, promulgated on June

28, 1988, we expressly established, "[The Congregation for the Doctrine of the Faith] examines delicts against the faith and more grave delicts whether against morals or committed in the celebration of the sacraments, which have been referred to it and, whenever necessary, proceeds to declare or impose canonical sanctions according to the norm of both common and proper law," thereby further confirming and determining the judicial competence of the same Congregation for the Doctrine of the Faith as an Apostolic Tribunal.

193.    The 2001 *Sacramentorum Sanctitatis Tutela* mandate expressly reserved to the Holy See's Congregation of the Doctrine of the Faith the right to deal with allegations of child sex abuse against priests.

194.    Under the mandatory policy contained in the 2001 *Sacramentorum Sanctitatis Tutela* mandate, the Holy See's Bishops, Archbishops, Cardinals and hierarchs are required to report any priest accused of the rape and sexual abuse of children to the Holy See's Congregation for the Doctrine of Faith.

195.    Actions of Defendant Holy See occurring in the United States include the transmission and receipt in the United States of policies, directives, orders or other direction or guidance, whether explicit or implicit.

196.    The Plaintiff has been and continues to be harmed as a result of the Holy See's practice and policy of not reporting the suspected rape and sexual abuse of children child by its agents to law enforcement officials and by requiring the absolute secrecy of all its agents who received reports of such abuse.

197.    There are children today who are in imminent danger of abuse because Defendant Holy See has failed to report or release the names of agents that have been either been convicted or credibly accused of molesting children, or that Defendant Holy See itself has found guilty of abuse.

198.    There are a number of priests, brothers, bishops and agents who the Holy See continued in ministry after it knew or suspected that those agents had raped and/or sexually assaulted children.

199.    The Holy See knew that there was a high probability that these clerics would rape and/or sexually assault more children, but sought to protect itself from scandal, sought to keep its income stream going, at the peril of children.

200.    Upon information and belief, the Holy See did not report all allegations of the rape and sexual assault of children by its agents and former agents to law enforcement, those directly in the path of danger, or the public.

201.    The Holy See adopted and enforced a policy and practice where its agents were not supposed to report abuse by its agents to law enforcement, those directly in the path of danger, or the public.

202.    The Holy See continues to address and handle child sexual abuse cases internally, putting children at risk of harm.

203.    The United States Catholic Conference of Bishops has indicated that over 6,000 clerics have been accused of abuse between 1950 and 2016. Less than 3,000 of these names have been released to the public.

204.    In the United States, Cardinal Bernard Law was accused of concealing information relating to child sexual abuse in the Boston Archdiocese. Specifically, Cardinal Law knew that priest John Geoghan had abused boys and been moved from parish to parish.

205.    Despite this, upon his resignation as Archbishop of Boston, Cardinal Law was promoted in Rome and became an archpriest of one of Rome's basilicas. He received a cardinal's funeral upon his death in 2017.

206.    In 2018, Carlo Maria Vigand, Titular Archbishop of Ulpiana and former Apostolic Nuncio in the United States, released a letter indicating that Defendant Holy See had been informed in at least 2000 of former Archbishop of Washington D.C.'s Theodore McCarrick's "gravely immoral behavior with seminarians and priests." McCarrick became a Cardinal in approximately 2001.

207.    In 2018, Fr. Boniface Ramsey released an October 2006 letter which he received from a top official of the Vatican Secretariat of State. In the letter, then Archbishop Leonardo Sandri acknowledged receipt of the allegations regarding McCarrick in 2000.

208.    After 2008, sanctions were imposed by Supreme Pontiff Benedict XVI upon McCanick due to his inappropriate behavior with seminarians and fellow priests.

209.    Archbishop Vigand indicated in his letter that he informed Supreme Pontiff Francis of McCarrick's inappropriate behavior and history of abuse in approximately 2013.

210.   Supreme Pontiff Francis remained complicit in the cover-up of McCarrick and did not take action as to McCarrick or accept McCarrick's resignation from the College of Cardinals until July 2018 after several accusations that McCarrick had sexually abused minors became public.

211.   In Minnesota, Bishop Michael Hoeppner in the Diocese of Crookston settled a lawsuit in 2017 brought against him individually for coercion and intentional infliction of emotional distress after he forced a survivor of sexual abuse to recant his report of abuse. In the process, Bishop Hoeppner violated a state court order requiring him to disclose the names and files of priests accused of abuse in the Crookston Diocese.

212.   Bishop Hoeppner remains the bishop in the Diocese of Crookston despite suppressing evidence of child sexual abuse after being ordered to produce such information by a state court judge.

213.   In 2017, Msgr. Carlo Alberto Capella was accused by United States authorities of possessing and distributing child pornography. Capella worked as a diplomat at Defendant Holy See's embassy in Washington, D.C. Instead of leaving Capella to be prosecuted in the United States, the Vatican invoked diplomatic immunity and Capella was recalled to the Vatican for investigation.

214.   Nearly seven months later, in April 2018, the Vatican police arrested Capella after the Vatican's Promotor of Justice conducted an investigation into the child pornography charges. A Vatican court sentenced Capella to five years in prison for the possession and distribution of child pornography in June 2018.

215.    Supreme Pontiff Francis has reiterated Supreme Pontiff Benedict's pledge of "zero tolerance" when it comes to sexual abuse of minors. Despite this, the Holy See continues to address allegations of child sexual abuse internally, refusing to release the names of the accused and promoting individuals who either perpetrated the abuse or helped conceal it.

216.    Holy See has known that child molesters have a very high rate of recidivism, meaning that they are likely to abuse more children. As such, it knew that children, parents, and guardians who did not possess the Holy See's knowledge about its agents and former agents and who unsuspectingly were around these agents and former agents were at a high risk to be sexually molested.

215.    Because of the high rate of recidivism, the Holy See's agents and former agents had probably already molested numerous children. As such, Defendant Holy See knew that there were many victims out there that were hurt because of its policies of secrecy, deception, and self-protection.

216.    At all times relevant hereto, children have been and remain at risk because the public and law enforcement do not know the identity and the locations of these agents and former agents of the Holy See who have been accused of the rape and sexual assault of children.

217.    Promises made by Defendant Holy See to address child sexual abuse have not been kept.

218.    In 2014, Supreme Pontiff Francis instituted a Pontifical Commission for the Protection of Minors ("PCPM"). This PCPM mandate ended in 2017 without a commitment from Supreme Pontiff Francis to renew the Commission.

219.    The PCPM was recently renewed in February 2018 after Supreme Pontiff Francis received criticism for his handling of the Bishop Barros matter in Chile.

220.    Two survivors appointed to the Commission terminated their involvement prior to its culmination because Defendant Holy See refused to implement recommendations that would protect children.

221.    In 2015, Supreme Pontiff Francis announced that he was going to create a tribunal inside the Congregation for the Doctrine of Faith to investigate and prosecute bishops who concealed sexual abuse.

222.    In 2016, Supreme Pontiff Francis announced that the tribunal would not be created.

223.    Supreme Pontiff Francis and the Holy See have the sole authority and power to dictate policies, procedures, and protocols regarding the Catholic Church. Most recently, this includes the following:

(a) In April 2016, Supreme Pontiff Francis issued an Apostolic Exhortation calling for Catholics to be more inclusive of homosexuals, divorced, and remarried Catholics;

(b) In December 2017, Defendant Holy See issued a decree stating that one cannot sell the hair strands, hands, teeth, or other body parts of saints;

(c) In February 2018, Supreme Pontiff Francis imposed a mandatory retirement age on clerics;

41

(d) In 2018, Defendant Holy See gave permission to the Diocese of Winona to change its name to the Diocese of Winona-Rochester; and

(e) In March 2018, Supreme Pontiff Francis issued an Apostolic Exhortation calling for Catholics to embrace holiness.

224.    Supreme Pontiff Francis has not issued any decree or Apostolic Exhortation regarding the prevention of clergy sexual abuse despite his authority to do so.

225.    At all times material hereto, the Holy See employed priests, including Reverend Timothy Cawley, to provide religious and pastoral services.

226.    Rev. Cawley's duties were limited to performing ecclesiastical and parochial services.

227.    Upon information and belief, at no time material hereto did Rev. Cawley perform legislative work or governmental functions on behalf of the Holy See and was not a civil servant or diplomatic or military employee of the sovereign Holy See.

228.    Rev. Cawley was employed by the Holy See as a priest.

229.    Upon information and belief, the duties of Rev. Cawley's employment included but were not restricted to teaching the word of God and the law of the church; providing religious, educational, and counseling services; and obtaining financial support for the Church.

230.    At all times relevant hereto, the Holy See controlled Rev. Cawley, was responsible for punishment if there was wrongdoing, and had some stake in paying Rev. Cawley for his services.

231.   At all times relevant hereto, the Holy See controlled all aspects of Rev. Cawley's conduct including his clothing, his routine, his practices, and his teachings.

232.   At all times relevant hereto, the Holy See also supplied Rev. Cawley with materials for his fundraising and solicitation of property.

233.   At all times relevant hereto, the Holy See had the sole authority to remove Rev. Cawley from his position as a priest.

234.   At all times relevant hereto, Rev. Cawley was a Roman Catholic priest, employed by and an agent of the Holy See, under its direct supervision and control, particularly on the issue of the rape and/or sexual assault of children.

235.   At all times relevant hereto, the Holy See also employed priests to recruit and solicit adults and children to become members of the financial operation so that the new members would contribute money.

236.   At all times relevant hereto, Rev. Cawley was ordained as a Roman Catholic priest remained under the Holy See's direct supervision, employ and control.

237.   At Ordination, each priest agrees to be obedient to their Bishop or Provincial and Defendant Holy See (the Supreme Pontiff).

238.   The Holy See has complete and final control over each Bishop, Archbishop, Cardinal, Religious Order Provincial, Religious leader and priest within the Catholic Church.

239.   The Holy See is a traditional monarchy, which means that it holds all authority in the first instance and any authority held by others within the institution is delegated from the Holy See.

240.    The Holy See has reaffirmed this on numerous occasions, including in its book of rules and regulations.

241.    The Holy See has complete and total control, including day-to-day control, over each aspect of the Catholic Church.

242.    To the extent that some of the entities underneath the Holy See's absolute control are separate corporations, then the Holy See maintains complete control over these separate corporations.

243.    The Holy See directs and requires each of these entities to strictly follow all of its policies and procedures, requires each of these entities to report its activities to it, requires each cleric working with the separate corporation to swear absolute obedience to the Holy See, and is the only entity that can create or terminate these corporations.

244.    With respect to the particular issue of the rape and sexual abuse of children, Holy See demands complete and unswerving obedience regarding procedures, the scope of potential penalties, and how each case will be disposed of ultimately.

245.    At all times relevant hereto, any corporations, including but not limited to any Archdiocese of New York and/or the Diocese of Jackson, Mississippi were and are the alter egos of the Holy See.

246.    At all times relevant hereto, the Defendant See retained and does still retain complete and final control over these corporations.

247.    At all times relevant hereto, the Holy See has day-to-day control of these entities through mandatory policies and procedures, mandatory meetings, mandatory obedience, and dictation of most aspects of their agents' lives.

44

248.    The Holy See determined long ago that it would require some of the entities under its control to incorporate in order to reduce its exposure to claims by people that it harmed, in order to keep the public from discovering its involvement in the systematic cover-up and concealment of the rape and sexual abuse of children by its agents, and in order to defraud those people that its agents harmed, including those that its agents sexually abused as children.

249.    The Holy See is the only entity that can fire a priest.

250.    The Holy See is the only entity that can fire a Bishop, Cardinal, or Religious leader.

251.    At all times relevant hereto, St. Mary of the Pines was a school to educate girls located in Chatawa, Mississippi was controlled, operated and run under Defendant Holy See's policies and protocols. Defendant Holy See controlled and mandated all aspects of the parish. The children relied upon Defendant and its agents to provide them with teaching and shelter at the facilities.

252.    Upon information and belief, Rev. Cawley was a fundraiser and solicitor of members for the Holy See who to recruited numerous children, adults and families to become paying members of the Holy See's organization.

253.    Upon information and belief, the Holy See wanted to retain Rev. Cawley's services as a fundraiser and recruiter.

254.    Rev. Cawley promised obedience to the Holy See (the Supreme Pontiff), the Bishop of the Diocese of Jackson, and his Provincial.

255.    Following his ordination, Rev. Cawley was authorized to represent himself as a priest of the Holy See, to wear uniform or vestments of a priest, to teach and counsel the public, including minors, on behalf of the Holy See and to otherwise exercise the rights, privileges and responsibilities of a Roman Catholic priest.

256.    Upon information and belief, from approximately 1965 to 1976, Rev. Cawley worked at, *inter alia*, St. Mary of the Pines in Chatawa, Mississippi.

257.    Upon information and belief, Rev. Cawley was appointed to teach, counsel, instruct and guide child parishioners at, *inter alia*, St. Mary of the Pines.

258.    In approximately 1967, Rev. Cawley anally raped sexually assaulted the Plaintiff on the grounds of St. Mary of the Pines.

259.    Upon information and belief, the Holy See allowed Rev. Cawley to have unsupervised and unlimited access to children at St. Mary of the Pines.

260.    Upon information and belief, Rev. Cawley' duties and responsibilities at St. Mary of the Pines included recruiting and soliciting children in the neighborhood and their families to become members of the Holy See's organization so that they would pay money to the organization.

261.    By placing Rev. Cawley and allowing him to work with children at St. Mary of the Pines, and by allowing Rev. Cawley to recruit and solicit children to become members, the Holy See affirmatively represented to minor children and their families, including Plaintiff, that Rev. Cawley did not have a history of raping and sexually abusing children and was not a danger to children, that the Holy See did not know or

suspect that Rev. Cawley had a history of molesting children and that Holy See did not know that Rev. Cawley was a danger to children.

261.    The Holy See was in a specialized position where it had knowledge that Plaintiff did not.

262.    The Holy See was in a position to have this knowledge because it was Rev. Cawley' employer, because it was responsible for Rev. Cawley and because its policies mandated secrecy with respect to the sort of knowledge learned about Rev. Cawley.

263.    The Plaintiff on the other hand, was a child. As a child she was not in a position to have information about Rev. Cawley's rape, sexual abuse and/or molestation of other children or of the Holy See's knowledge of the danger Rev. Cawley posed to children.

264.    As a child, the Plaintiff was not in a position to know that the Holy See mandated that its employees keep such knowledge from others, including children like her.

265.    In addition to the representations regarding safety being made directly to Plaintiff, the Holy See made these representations with knowledge and intent that they would be communicated to the minor Plaintiff through his parents/caregivers' words and actions.

266.    The Holy See also had reason to believe that the representations made to Plaintiffs parents/caregivers would influence Plaintiff and particularly that the representations would influence the amount and type of time spent alone with Rev.

Cawley, his access to Plaintiff, and Rev. Cawley' ability to rape and sexually assault Plaintiff.

267.    The Holy See knew or should have known that Rev. Cawley was a child molester and knew or should have known that Rev. Cawley was a danger to children before Rev. Cawley raped and sexually assaulted the Plaintiff.

268.    Because of the superiority and influence that the Holy See had over her, the Plaintiff believed and relied upon these misrepresentations.

269.    Rev. Cawley anally raped and/or sexually assaulted the Plaintiff in a classroom located on within the premises of St. Mary of the Pines.

270.    The anal rape and sexual assault of the Plaintiff by Rev. Cawley occurred while she was a minor and student at St. Mary of the Pines.

271.    The anal rape and sexual assault of the Plaintiff occurred while she was under the care, custody, authority, control and influence of Rev. Cawley and/or the catholic educational institution known as St. Mary of the Pines, which authority was granted to them by the, Holy See.

272.    The anal rape and sexual assault of the Plaintiff occurred while the abusive Roman Catholic priest, agent, servant or employee was acting in the scope of their employment, as part of an agency relationship with the Holy See, and the misconduct was committed with the apparent authority arising from the employment and/or agency relationship.

273.    Due to the nature of the duties of the Holy See's priests, clerics and agents and the vast disparity of power that existed within the aforesaid fiduciary relationship, the

Holy See, is liable for the negligent and/or wrongful conduct of its agents performing the Holy See's activities and commercial activities, including a course of fundraising activities and particular acts of administering private education and counseling programs in exchange for money.

274.   Had the Plaintiff or her family known what the Holy See knew or should have known - that Rev. Cawley was a suspected child molester and a danger to children before she was anally raped and sexually assaulted by Rev. Cawley – she would not have been anally raped and sexually assaulted.

275.   Had the Plaintiff and her family known that the Holy See knew that there was a widespread problem of its agents raping and sexually assaulting children using she would not have been anally raped and sexually assaulted by Rev. Cawley.

276.   As a direct and proximate result of the Holy See's conduct described herein, the Plaintiff has and continues to suffer, *inter alia*, physical, emotional, monetary and other damages.

277.   If the Holy See had not engaged in its vast enterprise of soliciting funds, recruiting members, and other commercial activities, and had not deceived the Plaintiff while undertaking this commercial activity, she would not have been anally raped and sexually assaulted.

278.   Upon information and belief, Peter's Pence, the Holy See's seminary activities, its solicitation of funds, and the other commercial and business activities described herein all had a direct role in causing the Plaintiffs harms.

49

279.    The Holy See has concealed and continues to conceal important information about its priests accused of the rape and sexual assault of children.

280.    Upon information and belief, prior to and since 1962, the Holy See failed to report multiple allegations of sexual abuse of children by its agents to proper civil authorities. As a result, children have been and continue to be at risk of being raped and/or sexually assaulted.

281.    As a direct result of the Holy See's conduct described herein, the Plaintiff has suffered, and will continue to suffer, great pain of mind and body, severe and permanent emotional distress, physical manifestations of emotional distress, embarrassment, loss of self-esteem, humiliation, physical, personal and psychological injuries.

282.    As a direct result of the Holy See's conduct described herein, the Plaintiff was prevented, and will continue to be prevented, from performing normal daily activities and obtaining the full enjoyment of life.

283.    As a direct result of the Holy See's conduct described herein, the Plaintiff has incurred and/or will continue to incur expenses for psychological treatment, therapy, and counseling.

284.    As a direct result of the Holy See's conduct described herein, the Plaintiff has and/or will incur loss of income and/or loss of earning capacity.

285.    The amount of the Plaintiffs damages will be fully ascertained at trial.

## COUNT I

## RESPONDEAT SUPERIOR LIABILITY

286.    The Plaintiff adopts, reiterates and incorporates by reference each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

287.    Because of the Plaintiff's position as a minor, together with the Diocese of Jackson, St Mary of the Pines and Rev. Crowley's positions as the agents of the Holy See as its church, priest and authority figure(s), they were able to have control and influence over the Plaintiff.

288.    By their words and actions, the Diocese of Jackson, St. Mary of the Pines and Rev. Crowley, as the agents of the Holy See, represented to the Plaintiff that the object of their relationship with her was to provide education, counseling, comfort, and advice.

289.    The words and actions of the Diocese of Jackson, St. Mary of the Pines and Rev. Crowley, as the agents of the Holy See were false and were intended to deceive the Plaintiff, to gain her trust and confidence, and to obtain control over her.

290.    The Plaintiff believed, justifiably relied on and gave trust and confidence to the Holy See's agents.

291.    The Holy See, by and through its agents, failed to report the sexual exploitation and misconduct involving the Plaintiff to any entity of law enforcement authority and successfully avoided criminal liability as a result.

292.    The applicable statutes of limitations are tolled because the Holy See and its agents concealed the exploitation and misconduct. As a result, the Plaintiff was unable to discover the wrongfulness of such conduct until recently.

293.    The applicable statute of limitations was further tolled because the Holy See's conduct placed the Plaintiff under duress.

294.    The Holy See's exploitation and concealment placed the Plaintiff under continuing duress in that it caused her to believe that she was at fault for having been raped and sexually assaulted by the Holy See's agent.

295.    The sexual abuse and exploitation of the Plaintiff by the Holy See by and through its agents and the circumstances under which it occurred caused the Plaintiff to develop various psychological mechanisms that reasonably made her incapable of ascertaining the resulting damages from that conduct.

296.    In approximately 1967, Defendant's agent Rev. Crowley engaged in unpermitted, harmful, criminal and offensive sexual conduct and contact on the person of Plaintiff in violation of, *inter alia*, the customary international laws of human rights as codified in the Universal Declaration of Human Rights, the Convention on Rights of the Child, the Federal common law, the law of the fifty states and the laws of the state of New York and Mississippi.

297.    The conduct of the agents, servants, employees and ostensible agents of the Holy See, in the states of, *inter alia*, New York and Mississippi in the United States set forth herein was committed in the course and scope of delegated duties and authority granted by the Holy See, thereby rendering it vicariously liable under the common law of

the states, the federal common law, the laws of the fifty states, the law of the states of

New York and Mississippi and customary international law of human rights for the

conduct of those agents, servants, employees and ostensible agents under the doctrine of

*respondeat superior* ("let the master answer").

298.    As a proximate result of the above-described conduct, the Plaintiff has

suffered, and continues to suffer, great pain of mind and body, shock, emotional distress,

embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life;

was prevented and will continue to be prevented from performing his daily activities and

obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity;

and/or has incurred and will continue to incur expenses for medical and psychological

treatment, therapy, and counseling.

299.    As a proximate result of the above-described conduct, the Plaintiff has been

damaged in an amount in excess of the minimum jurisdiction of this court.

## COUNT II

### VIOLATION OF CUSTOMARY INTERNATIONAL
### LAW OF HUMAN RIGHTS

300.    The Plaintiff adopts, reiterates and incorporates by reference each and every

allegation contained in the foregoing paragraphs as if set forth fully herein.

301.    The instructions, mandates and dictates of the Holy See in the United States

prohibiting the disclosure of the identity and existence of pedophiles and sexual predators

under its control, thereby placing children in a position of peril, is a gross violation of

well-established, universally recognized norms of international law of human rights.

302.    The customary international law of human rights has been codified in various international agreement, including but not limited to:

a.    the *Universal Declaration of Human Rights*, in that the Defendant, Holy See, as a matter of policy, at all times practiced, ignored, tolerated, disregarded, permitted, allowed, condoned or failed to report childhood sexual abuse which the international community and the civilized world views as cruel, inhumane and degrading; and

b.    the *Convention on the Rights of the Child,* in that the Defendant, Holy See, among other things, did not make the interests of minor children in its control their primary responsibility; did not conform to international standards for the safety and health of those children in considering the suitability of their priests, clerics, bishops, archbishops, cardinals, agents and servants; did not take all appropriate legislative, administrative, social and educational measures to protect those children from sexual abuse; did not prevent, identify, report, investigate, treat or follow-up on instances of childhood sexual abuse of which it had knowledge; did not take all appropriate measures to ensure that school discipline was administered in a manner consistent with human dignity; and did not undertake to protect those children from sexual exploitation and abuse.

304.    The Holy See, signed the *Universal Declaration of Human Rights* in 1948; it signed the *Convention on the Rights of the Child* in 1990.

305.    The worldwide acceptance of various international agreements, including the *Convention on the Rights of the Child*, demonstrates that some of their provisions have attained the status of customary international law.

306.    The *Convention on the Rights of the Child* provides that "in all actions concerning children . . . the best interests of the child shall be a primary consideration," Art. 3, that the signatories "shall take all appropriate legislative, administrative, social and educational measures to protect the child from all forms of physical or mental violence, injury or abuse, . . . , including sexual abuse," Art. 19, and that they "undertake to protect the child from all forms of sexual exploitation and sexual abuse," Art. 34.

307.    The *Convention on the Rights of the Child* codify longstanding legal human rights norms that reflect actual practices of states in prohibiting childhood sexual abuse, are not so novel as to be considered outside the bounds of what is customary and are of universal concern.

308.    The practices, instructions, mandates, and dictates of the Holy See, in the United States prohibiting the disclosure of the identity and existence of pedophiles and sexual predators under its control and thereby placing children in positions of harm, whether undertaken under the color of law or only in its capacity as a private actor, are violations of customary international law, and are crimes to which the law of nations attributes individual responsibility.

309.    As more fully set forth *supra*, the Holy See's agent Rev. Crowley engaged in unpermitted, harmful, criminal and offensive sexual conduct and contact on the person of Plaintiff in violation of, *inter alia*, the customary international laws of human rights as

55

codified in the Universal Declaration of Human Rights, the Convention on Rights of the Child, the Federal common law, the law of the fifty states and the laws of the state of New York and Mississippi.

310.    The conduct of the agents, servants, employees and ostensible agents of the See, in the states of, *inter alia*, New York and Mississippi in the United States set forth herein was committed in the course and scope of delegated duties and authority granted by the Holy See, thereby rendering it vicariously liable under the common law of the states, the federal common law, the laws of the fifty states, the law of the states of New York and Mississippi and customary international law of human rights for the conduct of those agents, servants, employees and ostensible agents under the doctrine of *respondeat superior* ("let the master answer").

311.    As a proximate result of the above-described conduct, the Plaintiff has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing her daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

312.    As a proximate result of the above-described conduct, the Plaintiff has been damaged in an amount in excess of the minimum jurisdiction of this court.

## COUNT III

## NEGLIGENCE

313.    The Plaintiff adopts, reiterates and incorporates by reference each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

314.    The Holy See, by and through its agents, servants and employees, breached duties owed to the Plaintiff under the common law of the states, the federal common law, the laws of the fifty states, the law of the states of, *inter alia*, New York and Mississippi and customary international law of human rights, including but not limited to:

      a.    The duty to provide safe care, custody and control of the minor children entrusted by their parents to the Roman Catholic churches and schools under the absolute control of the Defendant, Holy See.

      b.    The duty to warn parents who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church that priests and other clerics were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

      c.    The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, common law, and customary international law.

315.    The Holy See, knew that its priests, clerics and agents in the United States, including in the states of, *inter alia*, New York and Mississippi, were committing acts of childhood sexual abuse and engaging in dangerous and exploitive conduct as pedophiles, sexual predators and perpetrators of childhood sexual abuse, and that these priests,

57

clerics, bishops, archbishops, cardinals, agents, and employees created an unsafe condition on the premises of the aforesaid churches and schools, institutions to whom the custody and control of said minor children was placed.

316.    The acts and omissions of the Holy See alleged herein, including the concealment of its policy of harboring and protecting its abusive priests, agents and employees from public disclosure and prosecution and directives prohibiting the reporting of child sexual abuse to authorities, as part of a regular course of commercial conduct and particular commercial transactions and acts, were a substantial factor in bringing about the damages suffered by the Plaintiff as a result of childhood sexual abuse.

317.    As more fully set forth *supra*, the Holy See's agent Rev. Crowley engaged in unpermitted, harmful, criminal and offensive sexual conduct and contact on the person of the Plaintiff in violation of, *inter alia*, the customary international laws of human rights as codified in the Universal Declaration of Human Rights, the Convention on Rights of the Child, the Federal common law, the law of the fifty states and the laws of the state of New York and Mississippi.

318.    The conduct of the agents, servants, employees and ostensible agents of the Holy See, in the states of, *inter alia*, New York and Mississippi in the United States set forth herein was committed in the course and scope of delegated duties and authority granted by the Holy See, thereby rendering it vicariously liable under the common law of the states, the federal common law, the laws of the fifty states, the law of the states of New York and Mississippi and customary international law of human rights for the

58

conduct of those agents, servants, employees and ostensible agents under the doctrine of *respondeat superior* ("let the master answer").

319.    As a proximate result of the above-described conduct, the Plaintiff has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

320.    As a proximate result of the above-described conduct, the Plaintiff has been damaged in an amount in excess of the minimum jurisdiction of this court.

## COUNT IV

### BREACH OF FIDUCIARY DUTY

321.    The Plaintiff adopts, reiterates and incorporates by reference each and every allegation contained in the foregoing paragraphs as if set forth fully herein.

322.    A special legal relationship existed between the Plaintiff and the Holy See, in the nature of a fiduciary relationship, which relationship was carried out by and through its agents - priests, clerics and administrators - under the direct and absolute control of the Holy See, in their capacity as paid educators and/or counselors of minor children in the private schools of the Roman Catholic Church in the states of, *inter alia*, New York and Mississippi and the United States.

323.    The Holy See breached fiduciary duties owed to the Plaintiff under the common law of the states, the federal common law, the laws of the fifty states, the law of the states of, *inter alia*, New York and Mississippi and customary international law of human rights, including but not limited to:

    a.    The duty to warn parents, who entrusted their children's care, custody and control to the churches and schools of the Roman Catholic Church, that its priests, clerics and agents in those churches and schools were known pedophiles, sexual predators and perpetrators of childhood sexual abuse.

    b.    The duty to report known or suspected perpetrators of childhood sexual abuse to authorities as required by statutory law, the common law, and customary international law.

324.    As set forth more fully *supra*, the Holy See's agent Rev. Crowley engaged in unpermitted, harmful, criminal and offensive sexual conduct and contact on the person of Plaintiff in violation of, *inter alia*, the customary international laws of human rights as codified in the Universal Declaration of Human Rights, the Convention on Rights of the Child, the Federal common law, the law of the fifty states and the laws of the state of New York and Mississippi.

325.    The conduct of the agents, servants, employees and ostensible agents of the Holy See, in the states of, *inter alia*, New York and Mississippi in the United States set forth herein was committed in the course and scope of delegated duties and authority granted by the Defendant, Holy See, thereby rendering the Defendant, Holy See,

vicariously liable under the common law of the states, the federal common law, the laws of the fifty states, the law of the states of New York and Mississippi and customary international law of human rights for the conduct of those agents, servants, employees and ostensible agents under the doctrine of *respondeat superior* ("let the master answer").

326. As a proximate result of the above-described conduct, the Plaintiff has suffered, and continues to suffer, great pain of mind and body, shock, emotional distress, embarrassment, loss of self-esteem, disgrace, humiliation, and loss of enjoyment of life; was prevented and will continue to be prevented from performing his daily activities and obtaining the full enjoyment of life; has sustained loss of earnings and earning capacity; and/or has incurred and will continue to incur expenses for medical and psychological treatment, therapy, and counseling.

327. As a proximate result of the above-described conduct, the Plaintiff has been damaged in an amount in excess of the minimum jurisdiction of this court.

## COUNT V

### INJUNCTIVE RELIEF

328. The Plaintiff adopts, reiterates and incorporates by reference each and every allegation contained in the foregoing paragraphs if set forth fully herein.

329. As a result of the violations under the common law of the states, the federal common law, the laws of the fifty states, the law of the states of, *inter alia*, New York

and Mississippi and customary international law of human rights set forth herein, and in addition to monetary damages for those violations, the Plaintiff seeks orders:

      a.  requiring that the Holy See, cease its violations of the internationally recognized human rights of children;

      b.  requiring the Holy See, to report all allegations of childhood sexual abuse in each and every one of the United States;

      c.  requiring that the Holy See, conform its conduct to the mandates of the common law of the states, the federal common law, the laws of the fifty states, the law of the states of, *inter alia*, New York and Mississippi and customary international law of human rights;

      d.  requiring that Holy See, act in ways that are in the best interests of children, and

      e.  retaining jurisdiction in this Court for a period of no less than ten (10) years to ensure that the interests of children are not further compromised by the conduct of the Holy See.

**WHEREFORE,** the Plaintiff hereby demands judgment against the Defendant, Holy See, for compensatory damages and, where applicable, punitive damages; for the injunctive relief sought herein; for their costs herein expended, including attorneys' fees; for trial by jury on any and all issues so triable; and for any and all further legal and equitable relief to which the Court deems equitable, just and proper.

DATED this _____ day of February 2019.

**BIRZON & ASSOCIATES**

By: /s/ Mitchell J. Birzon, Esq.
   222 East Main Street, Suite 212
   Smithtown, New York 11787
   Tel: (631) 265-6300
   Fax: (631) 265-6799
   mjbirzon@bsb-lawyers.com
   *Attorneys for the Plaintiff*